# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DR. SHELDON KRIEGEL and RUTH KRIEGEL, on Behalf of Themselves and All Others Similarly Situated,      Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA, N.A.,      Defendant. | **Civil Action No. 07cv12246-NG** <br> *Designated as Lead Case* |
| VERA METZ, on Behalf of Herself and All Others Similarly Situated,      Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA CORPORATION and BANK OF AMERICA, N.A.,      Defendants. | **Civil Action No. 08cv11598-NG** <br> *Associated Case* |

GERTNER, D.J.:

## MEMORANDUM AND ORDER RE: MOTIONS TO DISMISS
### August 10, 2010

Plaintiffs, Vera Metz ("Metz") and Sheldon and Ruth Kriegel ("the Kriegels") have filed suit, separately, against Bank of America, N.A. ("BANA") and Bank of America Corporation ("BAC") for defendants' allegedly deceptive acts.[1]  Metz and the Kriegels opened certificates of deposit ("CDs") with BANA.  When the CDs' maturity date approached, BANA sent out notices informing plaintiffs that if they did not take any action, their CDs would automatically renew.  Plaintiffs claim that the notices were deceptive and wrongfully induced them to let the CDs renew at the then prevailing interest rate, which was lower than the rates they claim they could have received from the company's other offers, or from other companies, offers they would have taken if they had not opted for automatic renewal.

---

[1] Since the cases shared many factual issues, I consolidated them for the purposes of discovery.

I certainly understand plaintiffs' distress at what they felt was a sleight of hand, especially given the substantial sums of money invested.  But as I describe below, this was not a case of the complex legalese and fine print disclaimers.  The disclosures at issue could not have been more  straightforward, made on the Notice's first page.

Metz, a Washington resident, brings claims against BANA for violation of Washington's Consumer Protection Act, fraud, breach of contract, breach of the implied duty of good faith, and unjust enrichment.  She also brings claims against BAC, BANA's parent corporation, for violation of the Washington Consumer Protection Act, negligence, unjust enrichment, and negligent misrepresentation.  The Kriegels, Massachusetts residents, bring claims against BANA on behalf of a multi-state class of similarly-situated investors for violations of their respective state consumer protection statutes,[2] breach of the duty of good faith, breach of fiduciary duty, and unjust enrichment.

BANA has now brought three motions to dismiss – one against Metz (document #64) and two against the Kriegels (documents #87, 89) – as well as a motion to strike the class allegations in the Kriegels' complaint (document #91).  BAC has also brought a motion to dismiss against Metz (document #67).  Despite the manifold motions to dismiss and the thousands of pages of pleadings, both cases revolve around just two core issues: (1) Are the plaintiffs' state and common law claims preempted by the National Bank Act, 12 U.S.C. §§ 1 et seq. and related federal regulations?  (2) If not, was BANA's conduct deceptive or fraudulent?  I find that plaintiffs' claims are not preempted, but that BANA has not engaged in any wrongdoing.

---

[2] Specifically, the consumer protection statutes of Alaska, Arizona, Arkansas, Colorado, Connecticut, Delaware, D.C., Hawaii, Illinois, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Jersey, New York, North Carolina, North Dakota, Oklahoma, Oregon Pennsylvania, South Dakota, Utah, Vermont, and Wisconsin.

Therefore, BANA's and BAC's motions to dismiss for failure to state a claim (documents #64, 67, 87) are GRANTED.  Accordingly, the other motions are MOOT.

## I.    BACKGROUND

BAC is a bank holding company incorporated in Delaware, and BANA is a nationally chartered bank based in North Carolina.  BANA was directly held by NB Holdings Corporation, of which BAC was the parent corporation.

### A.    Metz

On August 1, 2007, Vera Metz, a Washington resident, invested $15,441.72 in a 330-day Risk-Free[3] CD at BANA with an interest rate of 4.79% and an Annual Percentage Yield (APY) of 4.80%.[4]  Metz Compl. ¶ 2.  At the time, she signed a Deposit Agreement, which set out the terms of the parties' relationship and the terms of the CD's automatic renewal.  Downey Aff. Ex. A  (Certificate of Deposit Receipt) (document #66-1), Ex. B (Deposit Agreement and Disclosures) (document #66-2).  With regard to renewal, the Agreement stated:

> [W]e automatically renew your account by reinvesting your funds on the maturity date, which is the day the term ends.  We reinvest both principal and interest unless you elect to have your interest disbursed . . . The term for this reinvested deposit is the same length as the previous term of your account.  The interest rate on the reinvested deposit is the rate we offer on the maturity date for the amount and term of the reinvested deposit.

Downey Aff. Ex. B at 6.  The Agreement also incorporated a "Personal Schedule of Fees," which set out interest rate information and account features.  Id. Ex. C (Personal Schedule of Fees) (document #66-3).  In the section on "Risk-Free" CDs, it provided: "[The CD]

---

[3] "Risk-Free" CDs allow customers to withdraw money early without penalty.

[4] APY takes into account the number of times interest is compounded yearly.  Interest rate (the "annual rate of interest" or "APR") does not.  Federal Reserve Bank of New York, Interest Rates: An Introduction, http://www.ny.frb.org/education/define.html.

[a]utomatically renews to another Risk Free CD/IRA with the same term, or, if we no longer

offer Risk Free CDs/IRAs with that same term, to a standard CD/IRA with the same term." Id.

at 6.

A few weeks before the CD's June 26, 2008, maturity date, BANA notified Metz that her

CD was about to mature.  Metz Compl. ¶ 2.  The notice stated:

> *If you'd like to continue with your current investment, you don't need to
> do a thing.  Your CD will renew automatically on each maturity date for
> the same term and compounding frequency, and will begin earning
> interest immediately at the current interest rate in effect at that time.*
> Since interest rates fluctuate with the market conditions, the interest rate
> and annual percentage yield effect at maturity are not determined yet;
> however, this information will be available on ___.  To obtain this
> information, you may call us at the number below.
>
> To allow extra time to make your investment decision, there is a 10-day
> grace period which for this term ends ___.  Remember, if you decide to
> withdraw your funds during this time, interest does not accrue after
> maturity.
>
> *Helping you make the most of your money is very important to us.*  Should
> you decide you want to move your money in another investment, we offer
> a wide variety of options to choose from.

Downey Aff. Ex. F (Maturity Notice) (document #66-7) (emphasis added).  Metz claims that the

highlighted assurances led her to believe that BANA would renew the CD at the best available

interest rate.  Based on this belief, she allowed BANA to automatically renew her CD.  Metz

Compl. ¶ 2.  On July 12, 2008, she was sent a CD Renewal/Receipt form that showed that

BANA had renewed her CD for an 11-month term at an interest rate and APY of 1.35%. Id.

Metz complained to BANA, and on July 29, 2008, one month after the automatic renewal, she

reinvested her funds without penalty in a 7-month CD with an interest rate of 3.40%. Id.

-4-

Metz brings this action on behalf of herself and all other similarly-situated BANA customers against BANA and BAC.  She alleges the Maturity Notice was deceptive because it gave no notice that the automatic renewal interest rate would be significantly lower than what she would have received without the automatic renewal.  Id. ¶ 1. Metz asserts that BANA and BAC engaged in fraudulent practices to induce elderly investors to renew their CDs at below market interest rates.  Id.

**B.      The Kriegels**

The Kriegels, Massachusetts residents, bring similar claims.  In February 2005, they became "Premier Banking Clients" of BANA, entitling them to certain perks.  Amended Kriegel Compl. ¶¶ 16-17.  The Kriegels claim one of these was investment management services.  Id. ¶¶ 10-15.  On August 1, 2006, the plaintiffs invested $327,947.99 in a 9-month Risk-Free CD with BANA at an interest rate of 4.41% and an APY of 4.50%.  Downey Aff. Ex. E (Maturity Notice) (document #93-5).

Like Metz, the Kriegels' CD was governed by the Deposit Agreement and Disclosures (Downey Aff. Ex. A (document #93-1), Downey Aff. Ex. G (Customer Agreement) (document #93-7)), which incorporated the Personal Schedule of Fees.  Id. Ex. B (document #93-2).  The Deposit Agreement provided the terms of automatic renewal, in language materially similar to that of the Deposit Agreement provided to Metz:

> Unless your account information states that your time deposit does not automatically renew, we automatically renew your account by reinvesting your funds. . . . The term for this reinvested deposit is the same length as the previous term of your account. . . . [T]he interest rate on the reinvested deposit is based on the rate we offer on the first day of the new term for the amount and term of the reinvested deposit.

Id. Ex. A at 5-6.  Similarly, the Personal Schedule of Fees provided with regard to Risk-Free

CDs: "Renewal Policy: [The Risk-Free CD] [a]utomatically renews to another Risk Free

CD/IRA with the same term . . . ." Id. Ex. B. at 17-18.

On April 11, 2007, the plaintiffs received a letter from BANA informing them that their

CD would soon mature.  Am. Kriegel Compl. ¶ 2. The Maturity Notice stated:

> *Because you're one of our best customers, you will receive a bonus added
> to the standard interest rate when your CD renews. . . . Your CD will
> automatically renew - there's nothing for you to do.*  Your new term and
> maturity date are noted above.  Your new interest rate has not yet been
> determined; however we will send you a Renewal Notice confirming your
> new rate and Annual Percentage Yield (APY).  To find out what your new
> interest rate and APY will be, you may call Customer Service at the
> number listed above on or after the maturity date. . . .

Downey Aff. Ex. E (emphasis added).

The plaintiffs allowed the CD to renew, believing that they would receive the "bonus"

rate.  Am. Kriegel Compl. ¶¶ 17-20. On May 1, 2007, they received a CD Renewal Receipt

informing them that their CD had been automatically renewed at a 2.62% interest rate, including

a 0.25% bonus for being "Premier" customers.  Id. ¶ 21.  Angry that the interest rate – even with

the "bonus" –  was significantly lower than that of the prior CD, plaintiffs called BANA and

closed the account without penalty.  Id. ¶ 23.  This action followed.

The plaintiffs allege that BANA purported to provide them with "Premier" services, but

instead automatically renewed their CD at a significantly lower rate than was being offered to

non-Premier customers.  Id. ¶¶ 17-21.  At the same time, BANA was offering an APY of 4.85%

on an 8-month standard CD, 3.80% APY on a 9-month standard CD, and 4.80% APY on an 11-

month Risk-Free CD.  Id. ¶ 21. Specifically, plaintiffs allege the deceptive practice was

misrepresenting that as "Premier" or "Plus" customers, the plaintiffs would receive preferential

service and rates on their CDs.  Id. ¶ 17.  In addition to these practices, the Kriegels assert that

BANA held itself out as a financial advisor to "Premier" customers.  They maintain that they

were induced to move their account to BANA as a result of representations that they would

receive special privileges and higher interest rates.  Id. ¶¶ 10-22.

The Kriegels brought suit against the BANA and BAC on behalf of a multi-state class of

similarly-situated investors for violation of their respective state consumer protection statutes,

breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and

unjust enrichment.  On March 6, 2009, I dismissed the Kriegels' complaint against BAC for

failure to allege facts demonstrating any theory under which BAC could be liable for BANA's

alleged misconduct.  Order of March 6, 2009 (document #39).

## II.   DISCUSSION

### A.   **Standard of Review**

In evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court draws all

reasonable inferences in plaintiff's favor and accepts all well-pleaded facts as true.  Sutliffe v.

Epping School Dist., 584 F.3d 314, 325 (1st Cir. 2009).  The Court may take into account

documents "central to plaintiffs' claim" or "sufficiently referred to in the complaint" without

converting a motion to dismiss into one for summary judgment.  Watterson v. Page, 987 F.2d 1,

3 (1st Cir. 1993).  To survive a motion to dismiss, the complaint must allege "enough facts to

state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S.

544, 570 (2007).

**B.        Plaintiffs' Claims Are Not Preempted**

BANA argues that the National Bank Act ("NBA"), 12 U.S.C. §§ 1 et seq., the OCC

Preemption Regulations, 12 C.F.R. § 7.4007, the Truth in Savings Act ("TISA"), 12 U.S.C. §§

4301 et seq., and Regulation DD, 12 C.F.R. §§ 230.1 et seq. preempt the state and common law

claims of all plaintiffs.

The NBA grants national banks "all such incidental powers as shall be necessary to carry

on the business of banking."  12 U.S.C. § 24.  The Office of the Comptroller of the Currency

("OCC") supervises the operation of national banks and promulgates regulations enumerating

banks' powers.  The Supreme Court has continually "held federal law supreme over state law

with respect to national banking," Watters v. Wachovia Bank, N.A., 550 U.S. 1, 10 (2007).

"Thus, a state law may be preempted by the National Bank Act when it frustrates or limits the

ability of a national bank to exercise its statutorily granted powers."  SPGGC, LLC v. Ayotte,

488 F.3d 525, 531 (1st Cir. 2007).  The OCC Preemption Regulation, 12 C.F.R. § 7.4007(b)

similarly states: "(b) Applicability of state law. (1) Except where made applicable by Federal

law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its

Federally authorized deposit-taking powers are not applicable to national banks."

The federal regulations governing CD disclosure requirements are fairly detailed.

Regulation DD requires banks to disclose CD account information like the APY and interest

rate, the maturity date, early withdrawal penalties, and renewal policies.  12 C.F.R. § 230.5

governs subsequent disclosures and requires disclosure of the maturity date of the CD and the

"interest rate and the annual percentage yield for the new account if they are known (or that

those rates have not yet been determined, the date when they will be determined, and a telephone

number the consumer may call to obtain the interest rate and the annual percentage yield that

will be paid for the new account) . . . ." 12 C.F.R. § 230.5 (b)(2)(ii)(B).  Finally, Appendix B to

Regulation DD gives sample forms for CD maturity notices:

> B--3--Model Clauses for Pre-Maturity Notices for Time Accounts
> (a)  Automatically renewable time accounts with maturities of one year or
> less but longer than one month.
> Your account will mature on (date).
> If the account renews, the new maturity date will be (date).
> The interest rate for the renewed account will be
> _____ % with an annual
> percentage yield of _____
> %.
> or
> The interest rate and annual percentage yield have not yet been
> determined. They will be available on (date). Please call (phone number)
> to learn the interest rate and annual percentage yield for your new account.

Regulation DD, 12 C.F.R. §§ 230 App. B Form B-3(a) ("Model Clauses for Pre-Maturity

Notices for Time Accounts").  TISA explicitly states that use of the Model Clauses, even if

rearranged (so long as the format does not affect the substance), will be deemed compliant with

the disclosure requirements.  12 U.S.C. § 4308(b).

Despite BANA's overbroad attack on state consumer protection laws, the NBA, TISA

and federal banking regulations preempt only *contrary* state law.  "[W]hen state prescriptions

significantly impair the exercise of authority, enumerated or incidental under the NBA, the

State's regulations must give way."  Watters,  550 U.S. at 12.  The NBA does not steamroll all

state laws that touch in some way on banks' conduct, which is what BANA seems to suggest.

Nationally chartered banks must comply with "state laws of general application in their daily

business" so long as "such laws do not conflict with the letter or the general purposes of the

NBA."  Id. at 11.  BANA simply goes too far in suggesting that the NBA, OCC regulations, and

TISA completely preempt any state law or common law claims, even those that do not conflict with the NBA.

For example, BANA argues that the First Circuit, relying on Watters, has held that state consumer protection act disclosure requirements are preempted by the NBA. Ayotte, 488 F.3d 525. But this is far too broad a reading. In Ayotte, the court held that a specific provision of the New Hampshire Consumer Protection Act that restricted the charging of fees on gift cards conflicted with the NBA and OCC regulations and was therefore preempted. 488 F.3d at 533-34. Section XIII of the Act prohibited "dormancy" and "latency fees" on gift cards. N.H. Rev. Stat. § 358-A:2. The OCC, however, issued regulations requiring the disclosure of administrative fees and expiration dates on gift cards, suggesting that the OCC sanctioned the expiration dates and fees. In fact, the OCC had even issued a bulletin in which it approved setting expiration dates on gift cards. OCC Bulletin No. 96-48, Stores Value Card Systems (Sept 10, 1996) ("Each system could have specific features such as limits on the amount of electronic cash that can be stored or cards that expire after some established time period."). Further, the OCC submitted an amicus brief to the First Circuit in which it stated that its regulations may even require gift cards to have expiration dates. Ayotte, 488 F.3d at 531-32. The Consumer Protection Act provision, therefore, directly conflicted with the OCC regulations. Id. at 533-34.

Applying Ayotte to the case at bar suggests that state consumer protection laws that demand something more than what TISA and the federal regulations require would likely be preempted as inconsistent with NBA's goal of uniformity and conflict with the OCC regulations on disclosure. Plaintiffs do not take issue with BANA's provision of the information required by TISA, or the federal regulations. They could not. BANA has clearly complied with federal

regulations, providing precisely the information required.  Its Maturity Notice closely mirrors the

Model Clause.  See 12 C.F.R. §§ 230 App. B Form B-3(a).  Nor do they argue that state

consumer protection statutes or common law duties require BANA to provide information in

addition to what they have already provided.  Rather, plaintiffs' focus on the  the *non-required*

statements made in the Maturity Notices which they claim are deceptive or in violation of state

law.  In other words, if BANA chooses to provide information beyond what the federal

regulations and statutes require, that information must not be misleading.

　　　Claims that the non-required statements need to be accurate, not deceptive or fraudulent,

else they violate state law, do not conflict with the NBA, OCC regulations, or TISA.  See Ayotte,

488 F.3d at 536 (holding that its ruling does *not* "preclude a state from enacting laws that

regulate activities of national banks or national thrifts, so long as those laws do not conflict with

the powers granted to national banks or national thrifts by the National Bank Act."  Other courts

have held that similar claims based on state consumer protection laws were not preempted.  At

most, the statutes had an "incidental effect" on the exercise of the national banks' powers.

Young v. Wells Fargo & Co., 671 F. Supp. 2d 1006, 1021 (S.D. Iowa 2009).  For example, in

Young, the court found that state law claims that "Wells Fargo had a legal duty not to employ

procedures designed to defraud borrowers by charging unreasonable fees" did not conflict with

NBA or OCC and therefore were not preempted.  Id. at 1022.  See also In re Checking Account

Overdraft Litigation, 694 F. Supp. 2d 1302, 1313 (S.D. Fla. 2010) (holding that state law

regulations on overdraft fees were not preempted); Mwantembe v. TD Bank, N.A., 669 F. Supp.

2d 545, 554-55 (E.D. Pa. 2009) ("Because enforcing Pennsylvania's consumer protection laws

will not interfere with the defendant banks' operation or otherwise unduly burden or impair their

ability to engage in the business of marketing and selling of gift cards, and there is no conflict with federal law, there is no basis for invoking federal preemption."); Jefferson v. Chase Home Finance, No. C 06-6510 , 2008 WL 1883484, at *10-*15 (N.D. Cal. Apr. 29, 2008) (holding that state consumer protection claims based on false advertising was not preempted by NBA or OCC regulations); Baldanzi v. WFC Holdings Corp., No. 07cv9551, 2008 WL 4924987, at *2 (S.D.N.Y. Nov. 14, 2008) ("In contrast to findings of federal preemption in cases involving specific state regulations that conflict with the NBA, causes of action sounding in contract, consumer protection statutes and tort have repeatedly been found by federal courts not to be preempted."). Plaintiffs' claims are not preempted.[5]

### C.   Metz's Complaint

#### 1.   BAC's Motion to Dismiss

Metz brings five claims against BAC:  Violation of the WCPA, fraud, negligence, unjust enrichment, and negligent misrepresentation.  BAC has moved to dismiss these claims pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b).

BAC could be liable to Metz either directly, for violations of its own, or indirectly, for violations of its subsidiary, BANA.  Metz has failed to plead sufficient facts under either theory. Since Metz has failed to meet the requirements of Fed. R. Civ. P. 12(b)(6), the Court need not examine her complaint against the heightened pleading standard of Fed. R. Civ. P. 9(b).

---

[5] This also dispenses with BANA's claim that ch. 93A exempts claims such as this one. Mass. Gen. L. c. 93A § 3 ("Nothing in this chapter shall apply to transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States.").  To the extent plaintiffs claim ch. 93A requires disclosures beyond those mandated by federal regulations, those claims are likely excluded.  But the core of plaintiffs' claims is that the added language ("Your CD will automatically renew - there's nothing for you to do.") is deceptive.  These claims are not exempted from ch. 93A.

### a.      Direct Liability

A parent corporation may be directly liable when "the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management" and "the parent is directly a participant in the wrong complained of." United States v. Bestfoods, 524 U.S. 51, 64 (1998) (internal quotations omitted).

There are no allegations that BAC had any direct contact with Metz, nor are there any facts alleged that BAC was a direct participant in the alleged wrong. Metz seems to base her theory of BAC's direct liability on BAC's "Code of Ethics."[6]  The Code of Ethics sets forth "basic guidelines of business practice and professional and personal conduct" for associates and directors of BAC and its subsidiaries. Downey Aff. Ex. O at 3, 5 (document #66-15).  It provides policies for avoiding conflicts of interests and the disclosure of confidential information and warns of internal disciplinary action against associates for violations of the Code. Id. Nothing in the Code of Ethics addresses the policies about which Metz complains or provides any basis for liability. See Commercial Dev. Co. v. Abitibi-Consolidated Inc., No. C07-5172RJB, 2008 WL 110513, at *1 (W.D. Wash. Jan 8, 2008) ("[N]o separate cause of action exists to sue for violations of a code of ethics."); Interactive Intelligence, Inc. v. Keycorp, No. 1:05-cv-1518, 2007 WL 3171438, at *2 (S.D. Ind. Oct. 26, 2007) (finding breach of Code of Ethics does not create private cause of action); Nabisco, Inc. v. Ellison, No. 94-1722, 1994 WL 622136, at *4 (E.D. Pa. Nov. 8, 1994) (holding plaintiff failed to state a cause of action upon breach of code of ethics).

---

[6] "Bank Corp. owed a duty of care to Plaintiff and the other class members to ensure that Defendant Bank of America, N.A. complied with Defendant Bank Corp's stated Code of Ethics and did not engage in the deceptive conducted [sic] alleged herein."  Metz Compl. ¶ 59.

Further, Metz has not alleged facts that show BAC played a direct role in any of BANA's banking activities.  While the two entities clearly have similar names, the Deposit Agreement governing Metz's CD specifically defines the terms "Bank of America," "we," "us," and "our" as referring to Bank of America, N.A.  Downey Aff. Ex. B at 1.  Metz's relationship was solely with BANA.  The pleadings are insufficient to support a claim for direct liability against BAC.

### b.      Derivative Liability

A parent corporation can only be held liable for a subsidiary's actions if the plaintiff can pierce the corporate veil.  Bestfoods, 524 U.S. at 62.  The veil-piercing standard is a matter of state law.  The choice of law is not material here (whether it be that of Washington, Metz's place of residence, Delaware, BAC's place of incorporation, or North Carolina, where BANA is based) because all require that the parent corporation exercise control and dominion over the subsidiary such that the two were functionally the same entity.  Minton v. Ralston Purina Co., 47 P.3d 556, 562 (Wash. 2002); Mobil Oil Corp v. Linear Films, Inc., 718 F. Supp. 260, 267-70 (D. Del. 1989); Glenn v. Wagner, 329 S.E.2d 326, 331 (N.C. 1985).

All Metz has asserted is parental control and the presence of BAC insignia on some documents.  This alone is not enough.  See Bestfoods, 524 U.S. at 61 (holding that mere existence of parent-subsidiary relationship is insufficient to hold parent liable for subsidiary's acts); Fletcher v. Atex, Inc., 68 F.3d 1451, 1460 (2nd Cir. 1995) (Use of logo is "not evidence that the two companies operated as a 'single economic entity.'").  Nor does the Code of Ethics demonstrate that BAC exercised pervasive control over BANA.  See DeLia v. Verizon Communications, Inc., 258 F.R.D. 189, 192 (D. Mass. 2009) (holding presence of parent's logo on paychecks issued to subsidiary's employees and application of parent's code of conduct to

-14-

subsidiaries to be insufficient to pierce corporate veil as matter of law).  Even construing the

complaint liberally, Metz has failed to allege any facts warranting BAC derivative liability.  Since

Metz asserts Claims Five, negligence, and Seven, negligent misrepresentation, only against BAC,

see P.'s Opp. at 25 n.12 (document #18), these claims are dismissed in their entirety.

### 2.    BANA's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

Metz brings five claims against BANA: Violation of the WCPA, fraud, breach of contract,

breach of the implied covenant of good faith and fair dealing, and unjust enrichment.  Metz

Compl. ¶¶ 27-76.  Her claims are governed by Washington law, as set out in the Deposit

Agreement[7] and are uncontested by either party.

### a.    WCPA

The WCPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or

practices in the conduct of any trade or commerce."  Wash. Rev. Code. § 19.86.020.  A plaintiff

must allege and prove five elements to succeed in a WCPA claim: "(1) unfair or deceptive act or

practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff's

business or property; and (5) causation."  Hangman Ridge Training Stables, Inc. v. Safeco Title

Ins. Co., 719 P.2d 531, 533 (Wash. 1986).  For an act to be unfair or deceptive, the plaintiff "need

not show that the act in question was *intended* to deceive, but that the alleged act had the *capacity*

to deceive a substantial portion of the public."  Id. at 535.  A material misrepresentation or

knowing omission is "deceptive."  Stephens v. Omni Ins. Co., 159 P.3d 10, 18-19 (Wash. Ct.

App. 2007).  Whether an act is unfair or deceptive is a question of law.  Leingang v. Pierce

County Medical Bureau, Inc., 930 P.2d 288, 297 (Wash. 1997).

---

[7] Your . . . rights and obligations under this Agreement "are governed by and interpreted according to
federal law and the laws of the state where [BANA] open[s] your account . . . ." Downey Aff. Ex. B.

-15-

I agree with plaintiff that the Maturity Notice's opening statement ("If you'd like to continue with your current investment, you don't need to do a thing.") is misleading if read on its own.  When read with the rest of the letter, however, it becomes clear that the interest rate will not be the same as that of the prior CD, but will instead be the rate in effect at the time of renewal. In the next two sentences, the Notice explicitly states that the new CD will earn interest "at the current interest rate in effect at that time.  Since interest rates fluctuate with the market conditions, the interest rate and annual percentage yield effect at maturity are not determined yet; however, this information will be available on ____."  It then gives a phone number to call for that information.

While a "knowing failure to reveal something of material importance is 'deceptive' within the [W]CPA," Robinson v. Avis Rent A Car System, Inc., 22 P.3d 818, 824 (Wash. Ct. App. 2001), BANA included all the disclosures required by federal law[8] and necessary for plaintiffs to make an informed decision about whether to renew the CD (or at least guidance about how to obtain that information).

This would be a different case if BANA had not included information about the fluctuating interest rates or if it had buried this information in the fine print.  But the Maturity Notice is only two pages, and more importantly, the required information is in just the next sentence.  BANA's Maturity Notice is not "deceptive."  See Robinson, 22 P.3d at 826 (finding no unfair or deceptive act where car rental company billed separation concession fee in addition to quoted rate where company disclosed the concession fee to customers).

---

[8] Any claim that BANA should have disclosed more would likely be preempted.  See supra Section II.B.

### b.      Breach of Contract

Metz argues that the Maturity Notice set out the terms of her contract with BANA.  She treats the Maturity Notice as an offer from BANA to roll over the CD and her "doing nothing" as an acceptance, which together created a binding contract.  In the Notice, BANA agreed that when Metz renewed the CD, it would "begin earning interest immediately at the current interest rate in effect at that time."  Metz asserts that the phrase "interest rate in effect at that time" means the market interest rate or the best available rate.

Whether the Maturity Notice supplanted the Deposit Agreement as the governing contract is immaterial because the terms of both are the same.  Either way, there was no breach.  A breach of contract is actionable only if (1) a contract imposes a duty, (2) the defendant breaches that duty, and (3) the breach proximately causes damage to the plaintiff.  Northwest Independent Forest Mfrs. v. Dept. of Labor & Indus., 899 P.2d 6, 9 (Wash. App. Ct. 1995).  The burden of proving a contractual duty is on the party asserting it.  Cahn v. Foster & Marshall, Inc., 658 P. 2d 42, 43 (Wash. Ct. App. 1983).

To the extent Metz attempts to claim that the phrase "interest rate in effect at that time" means an interest rate similar to or better than the one she was receiving on her prior CD, there is simply no support.  Contractual language should be interpreted in accordance with its plain meaning.  Boeing Co. v. Aetna Cas. and Sur. Co., 784 P.2d 507, 511 (Wash. 1990).  BANA renewed the CD with the rate of interest in effect *at the time* for an 11-month CD -- 1.35%.  Downey Aff. Ex. H (Consumer Deposit Interest Rates and Annual Percentage Yields, June 26, 2008) (document #66-8).  That is exactly what the Notice provides for.

### c.      Fraud

There are nine elements to a fraud claim under Washington law: (1) representation of fact; (2) materiality; (3) falsity; (4) defendant's awareness of its falsehood; (5) defendant's intent in making the representation; (6) plaintiff's ignorance of the statement's falsehood; (7) plaintiff's reliance on the truth of the representation; (8) the reasonableness of that reliance; and (9) plaintiff's damages.  Stiley v. Block, 925 P.2d 194, 204 (Wash. 1996).  Metz cannot meet several of these requirements.

First, BANA did not misrepresent or conceal material facts.  In fact, it disclosed as much as it knew at the time it sent the letter; the market interest rate had not yet been determined. Second, Metz could not have reasonably believed that her funds would be automatically reinvested in the "best available" CD when the Notice made no such representations.  While the first sentence did encourage Metz to "do nothing," the rest of the Notice made clear that the interest rate was subject to change.  "[P]arties have a duty to read the contracts they sign."  Del Rosario v. Del Rosario, 97 P.3d 11, 16 (Wash. 2004).[9]  Metz cannot demonstrate fraud on the part of BANA.

### d.      Breach of Implied Covenant of Good Faith and Fair Dealing

The duty of good faith applies when "the contract gives one party discretionary authority to determine a contract term . . . ."  Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc., 935 P.2d 628 (Wash. Ct. App. 1997).  Here, Metz claims that since BANA had discretionary authority to determine the interest rate, it had a good faith duty to make a full representation about the range

---

[9] BANA also argues that the economic loss rule, which "bar[s] recovery for alleged breach of tort duties where a contractual relationship exists and the losses are economic losses," Alejandre v. Bull, 153 P.3d 864, 868 (Wash. 2007), bars Metz's tort claims.  While the Washington Supreme Court has held that fraudulent concealment claims fall outside the economic loss rule, it has not addressed whether fraudulent representation, or fraud, claims do as well.  Id. at 871, 872 n.6; see also Carlile v. Harbour Homes, 194 P.3d 280, 286 (Wash. App. Ct. 2008).  The Court need not decide this issue here because Metz's fraud claim is dismissed on other grounds.

of rates available and the best available rate.  BANA breached this duty by renewing at below the

bank-offered and market rates.

The duty of good faith and fair dealing "obligates the parties to cooperate with each other

so that each may obtain the full benefit of performance."  <u>Badgett v. Security State Bank</u>, 807

P.2d 356, 360 (Wash. 1991).  It requires simply that the parties carry out their contractual duties

in good faith.  <u>Id.</u>  Therefore, the duty of good faith "arises only in connection with terms agreed

to by the parties."  <u>Id.</u>

BANA was subject to the duty of good faith in its dealings with Metz, but it does not

reach as wide as Metz would like.  To the extent Metz alleges that BANA has an affirmative duty

to reinvest the funds in another CD with the highest rate of interest or expressly warn that funds

might earn a lower rate, this is beyond what good faith requires.  Good faith "does not create

independent substantive contractual rights."  <u>McGowan v. Pillsbury Co.</u>, 723 F. Supp. 530, 539

(W.D. Wash. 1989).

BANA complied with federal law about necessary disclosures.  It explicitly stated that the

interest rates had not yet been determined, but they would be available at a certain date and gave

the phone number to call.  Further, BANA implemented its express representations; it renewed

Metz's CD at the interest rate in effect at the time – 1.35%.

Metz seems to be arguing that 1.35% somehow is not adequate because it is not the

"market interest rate."  She does not define "market interest rate" or "market rate," though her

pleadings suggest she means either the rate BANA was offering on other CDs or the rate other

banks were offering on their CDs.  In any case, there are two kinks in this argument:  First,

BANA did not contract to provide the "market interest rate;" it contracted to provide "the interest

rate in effect at that time; and second, even if BANA had contracted to provide the "market interest rate," the reasonable interpretation of that phrase would be the interest rate in effect for anyone opening a CD for that term on that date.  This is precisely the rate that BANA offered.

e.      **Unjust Enrichment**[10]

Under Washington law, unjust enrichment is composed of three elements: "(1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment."  Young v. Young, 191 P.3d 1258, 1262 (Wash. 2008).  Again, plaintiff has failed to make out essential elements of the claim.

First, it is unclear exactly what plaintiff's loss was.  She does not allege that BANA delayed in any way or penalized her for switching CDs.  Metz received the then-current interest rate on a CD with the same term.  While better interest rates were available on other CD products, BANA had no duty to automatically renew her CD into the vehicle with the best rate.  Indeed, the "best" combination of interest rate and term on a given CD will be particular to the customer.  BANA had no way of knowing in advance which CD a customer would prefer; its default presumes that customers will choose a CD of the same term.  Of course, if Metz had received a lower interest rate than that offered to customers opening up 11-month CDs on the date of her renewal, she would have suffered a loss; but that is not the case here.

Metz asserts that BANA's "benefit" was the retention of her money at a lower interest rate.  Again, this begs the question – a lower interest rate than what?  BANA had no duty to offer

---

[10] BANA argues that Metz cannot plead unjust enrichment where a contract exists, but she may plead in the alternative.  Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1555 (1st Cir. 1994).  "Courts have been flexible regarding when in the trial they require the plaintiff to choose its avenue of recovery."  Commonwealth v. Mylan Laboratories, 357 F. Supp. 2d 314, 324 (D. Mass. 2005).

Metz a CD at the same rate her prior CD earned (indeed, no CD was offering a comparable rate), nor did it know in advance which CD she would prefer.  Metz has failed to demonstrate that BANA was unjustly enriched.

> **D.      BANA's Motion to Dismiss the Kriegels' Complaint Pursuant to Fed. R. Civ. P. 12(b)(6)**

The Kriegels bring four claims against BANA: Violation of numerous state statutes prohibiting unfair and deceptive trade practices, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and unjust enrichment.  Their claims are governed by Massachusetts law, in accordance with the Deposit Agreement,[11] and uncontested by either party.

> **1.      Breach of Fiduciary Duty**

The Kriegels allege that BANA advertised preferential treatment and investment services for its Premier customers, which created a fiduciary relationship.  It therefore owed plaintiffs a duty to disclose all facts that might reasonably affect their investment decisions.  Plaintiffs base their claim of a fiduciary relationship on statements on BANA's website about its "Premier" customer services.  These include:

> Wealth Management Premier Banking & Investments: Your dedicated Premier Banking & Investments team works together on your behalf. Through them, you can easily access tailored banking and investment solutions and thoughtful guidance to address your financial challenges and opportunities.  Am. Kriegel Compl. ¶ 10.

> Introducing Premier Banking & Investments: Premier Banking & Investments brings together personalized banking and investment expertise on one team dedicated to you. A Premier Banking Client Manager and a Banc of America Investment Services, Inc., Financial Advisor work

---

[11] "Your and our rights and obligations under this Agreement are governed by and interpreted according to federal law and the laws of the state where [BANA] open[s] your account or, if we transfer your account to another location, where we currently maintain your account."  Downey Aff. Ex. A at 2 (Deposit Agreement) (document #93-1).

directly with you to provide comprehensive financial strategies and customized banking and investment solutions to help you manage your financial life and pursue your goals. You will receive priority service, have access to specialized product solutions, and be recognized as a valued client throughout the Bank of America family. Id. ¶ 11.

Financial Strategies: A dedicated financial team committed to providing you with comprehensive financial strategies and access to customized credit, deposit and investment solutions from Bank of America and Banc of America Investment Services, Inc. Id.

Helping you build and manage your wealth. In-depth guidance and solutions. A Dedicated Financial Team: a Premier Banking Client Manager and a Banc of America Investment Services, Inc. Financial Advisor work closely with you to understand your needs. They provide guidance and customized investment, deposit and credit solutions utilizing the full scope of our company's expert resources and our broad spectrum of investment and banking products. Your Financial Advisor from Banc of America Investment Services, Inc. will focus on investments and your Client Manager from Bank of America will coordinate the credit and cash management portion of your portfolio. Id. ¶ 12.

Working with a Client Manager and a Financial Advisor, you are guided through a thoughtful, four-step consultative process to design and implement your financial strategy. Ongoing reviews and monitoring. Your Financial Advisor then assists you in tracking, researching and evaluating your investments to ensure that your overall financial strategy remains focused on your needs and goals. Id. ¶ 13.

To satisfy the elements of a claim for breach of fiduciary duty, the plaintiff must allege four elements: "(1) existence of a fiduciary duty arising from a relationship between the parties, (2) breach of that duty, (3) damages, and (4) a causal relationship between the breach and the damages." Qestec, Inc. v. Krummenacker, 367 F. Supp. 2d 89, 97 (D. Mass. 2005). Plaintiffs cannot show a fiduciary relationship existed.

First, they have taken BANA's statements out of context, cherry-picking phrases from advertisements on BANA's website. At best, viewed in the light most favorable to plaintiffs, these statements constitute an offer for financial advisor services. Plaintiffs, however, have given

no indication that they accepted BANA's offer for advisory services or that they relied on them in any way.  "[O]ne party cannot unilaterally transform a business relationship into a fiduciary relationship by reposing trust and confidence in another."  Flaherty v. Baybank Merrimack Valley, N.A., 808 F. Supp. 55, 64 (D. Mass. 1992).  Indeed, plaintiffs' complaint does not even contain allegations that they read these statements.  See DeBlasio v. Merrill Lynch & Co., Inc., No. 07cv318, 2009 WL 2242605, at *30 (S.D.N.Y. July 27, 2009) (finding no fiduciary duty where "[n]o Plaintiff alleges that he or she sought such [investment advisory] services . . . [or] that he or she read the advertisements and promotional materials cited in the [complaint], and there are almost no specific allegations regarding any of Plaintiffs' relationships with the Brokerage Defendants.").  Simply put, there is no evidence of a fiduciary relationship.

Furthermore, BANA's generalized marketing and "puffing" cannot give rise to a fiduciary relationship.  "A sales pitch . . . does not a fiduciary relationship create.  Were that the case, each of millions of commercial transactions that take place every day would give rise to duties that far exceed the scope of the relationships that created them."  Café La France, Inc. v. Schneider Securities, Inc., 281 F. Supp. 2d 361, 373 (D.R.I. 2003).  See Gemini Investors, Inc. v. Ches-Mont Disposal, LLC, 629 F. Supp. 2d 163, 168 (D. Mass. 2009) (Where company "made numerous representations as part of its marketing efforts, for instance, that [it] had 'relevant industry experience,'" this did not create a fiduciary duty.); DeBlasio, 2009 WL 2242605, at *20, *23 (Statements such as "[o]btaining your financial goals is number one . . . on your Financial Advisor's list,"  "[a]t Wachovia Securities, our Financial Advisors are committed to your financial welfare," or we "emphasize[] the importance in confiding and relying on the personal relationship with the Smith Barney Financial Advisor" are puffery.).  No reasonable investor would rely on

such general advertisements to create a fiduciary relationship.  See NPS, LLC v. Ambac Assur. Corp., No. 08-11281-DPW, __ F. Supp. 2d. __, 2010 WL 723786, at *13 (D. Mass. Feb. 25, 2010) (holding that reliance on hazy "rosy" commercial affirmations was not reasonable); In re Allaire Corp. Sec. Litig., 224 F. Supp. 2d 319, 333 (D. Mass. 2002) (Where commercial statements contained no specific claims, they were "puffing" and it was unreasonable for investor to rely upon them).  In addition, the Deposit Agreement includes a clause expressly disavowing any fiduciary relationship.  Downey Aff. Ex. A at 1.  While the existence of a fiduciary relationship is a factual determination, Savoy v. White, 139 F.R.D. 265, 267 (D. Mass. 1991), the contractual language suggests that plaintiffs' position that a fiduciary relationship existed is unreasonable.

Moreover, Massachusetts courts generally view the commercial bank-customer relationship as contractual one.  See Flaherty, 808 F. Supp. at 64 ("Traditionally, Massachusetts courts have viewed a bank's relationship to its customers simply as one of creditor and debtor . . . ."); National Shawmut Bank of Boston v. Hallett,  78 N.E.2d 624, 628 (Mass. 1948) (holding relationship between debtor and creditor is not fiduciary); Islam v. Option One Mortgage Corp., 432 F. Supp. 2d 181, 195 (D. Mass. 2006) (quoting In re Greenberg, 212 B.R. 422, 428 (Bankr. D. Mass. 1997) ("'[A] bank's relationship to its customers [is] simply [ ] one of creditor and debtor . . .' - an arm's-length, business relationship.  No fiduciary duty is owed."); Capizzi v. F.D.I.C., No. 90-12775-S, 1993 WL 723477, at *11 (D. Mass. Mar. 9, 1993) (quoting Flaherty, 808 F. Supp. at 64); cf. Fine v. Sovereign Bank, 671 F. Supp. 2d 219, 227 (D. Mass. 2009) (citing SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 191 (1963) (holding that investment advisor who handled client funds was a fiduciary with respect to investors).

Indeed, BANA did not possess the *sine qua non* of a fiduciary relationship in the financial advisor context – discretion.  "Where the account is 'non-discretionary,' meaning that the customer makes the investment decisions and the stockbroker merely receives and executes a customer's orders, the relationship generally does not give rise to general fiduciary duties."  Patsos v. First Albany Corp., 741 N.E.2d 841, 849 (Mass. 2001).  BANA had absolutely no discretion to re-invest plaintiffs' money into another CD without their express permission.  Their ability (and duty) to act extended only so far as the contract allowed.  Indeed, if BANA *had* re-invested plaintiffs' money into a different vehicle, it would have been liable for breach of contract.  Its relationship with plaintiffs was purely contractual; BANA owed no fiduciary duties to plaintiffs.

### 2.      Violations  of State Statutes Prohibiting Unfair and Deceptive Trade Practices

The Kriegels allege that BANA has violated Mass. Gen. L. c. 93A § 2(a), which prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."  What constitutes an "unfair or deceptive" act under Chapter 93A is a question of law.  Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd., 217 F.3d 33, 40 (1st Cir. 2000).  Courts have described conduct as deceptive when it has "the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted."  Aspinall v. Philip Morris Companies, Inc., 813 N.E.2d 476, 488 (Mass. 2004)

In order for conduct to violate ch. 93A, "(1) it must fall within at least the penumbra of some common-law, statutory, or other established concept of unfairness, (2) it must be unethical or unscrupulous, and (3) it must cause substantial injury to a consumer or another businessman."

Wasserman v. Agnastopoulos, 497 N.E.2d 19, 23 (Mass. App. Ct. 1986) (internal quotations omitted). The SJC has held that a communication may contain accurate information and still be deceptive. The information "may consist of a half truth, or even may be true as a literal matter, but still create an over-all misleading impression through failure to disclose material information." Aspinall, 813 N.E.2d at 487.

Plaintiffs allege that BANA's allegedly deceptive or unethical practice was its representation that as "Premier" customers, the Kriegels would receive preferential interest rates on their CDs. Instead, BANA automatically renewed their CD at a lower rate than that being offered to non-Premier customers – for example, an 8-month standard CD with an APY of 4.85%, a 9-month standard CD with an APY of 3.80%, and an 11-month Risk-Free CD with an APY of 4.80%. Downey Aff. Ex. B (May 1, 2007 CD Rates) (document #73-2); Ex. O (May 17, 2007 CD Rates) (document #73-16).

BANA's letter made no such representation. As with the Maturity Notice sent to Metz, the first sentence of the Maturity Notice ("Your CD will automatically renew - there's nothing for you to do.") is perhaps misleading if read on its own. But the rest of the paragraph makes clear that the interest rate has not yet been determined, but that it would be the rate at the time of maturity. The Notice then provides contact information where customers may learn what the new interest rate is. Downey Aff. Ex. I (Maturity Notice). Nowhere in the letter does the language support an inference that BANA will automatically renew the plaintiffs' CD into one with the highest interest rate. That is simply too great a leap.

In fact, BANA did precisely what is was contractually obligated to do. Both the Maturity Notice and the original Deposit Agreement require BANA to renew the deposit into a CD of the

same term and type.  Downey Aff. Ex. F (Deposit Agreement) (document #73-7); Ex. I (Maturity

Notice) (document #73-9).  The renewed CD was a 9-Month Risk-Free CD, the same as the

Kriegel's prior CD.  Further, BANA gave them the promised bonus ("Because you're one of our

best customers, you will receive a bonus added to the standard interest rate when your CD

renews."), adding 0.25% onto the standard interest rate.

Plaintiffs are looking at the wrong comparables.  They had a 9-Month Risk-Free CD.  The

other products are for different terms or types of CDs.   The 9-Month Risk-Free CD rate on the

day of renewal was 2.62%.  Downey Aff. Ex. B (May 1, 2007 CD Rates).  As I discussed above

with regard to Metz's claims, banks do not know *a priori* which interest rate, term, or type of CD

a customer will prefer.  BANA chooses as its default to renew into the same term, and it discloses

as much in the original deposit agreement and the Maturity Notice.  BANA disclosed all

necessary material information; its Notice did not create a "misleading impression." Aspinall, 813

N.E.2d at 487.

### 3.        Breach of Implied Covenant of Good Faith and Fair Dealing

The Kriegels argue that by using deceptive Maturity Notices to encourage automatic

renewal and using negative consent to apply the lowest interest rate to the automatically renewed

CDs, BANA breached the implied covenant of good faith.  Massachusetts law approaches breach

of good faith in much the same way as Washington law.  A covenant of good faith and fair

dealing is implied in every contract.  Anthony's Pier Four, Inc. v. HBC Associates., 583 N.E.2d

806, 820 (Mass. 1991).  While a "party may breach the covenant of good faith and fair dealing

implicit in every contract without breaching any express term of that contract," Speakman v.

<u>Allmerica Financial Life Ins.</u>,  367 F. Supp. 2d 122, 132 (D. Mass. 2005), the duty of good faith does not create independent extracontractual rights.

As I explained above, BANA adhered to its contractual obligations set out in the Deposit Agreement and Maturity Notice.  Both parties received the benefits contained in the contract; there was no breach of the duty of good faith.  <u>See</u> <u>Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.</u>, 805 N.E.2d 957, 964 (Mass. 2004) ("The covenant may not . . . be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.").

### 4.      Unjust Enrichment

The Kriegels argue that BANA was unjustly enriched to their detriment by reinvesting their deposits at a higher interest rate while paying them a lower rate.  I need not dwell on this claim long, as it is nearly identical to Metz's claim.  To succeed on a claim for unjust enrichment, a plaintiff must show: "(1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) an absence of justification and (5) the absence of a remedy provided by law." <u>Mylan Laboratories</u>, 357 F. Supp. 2d at 324.  As I discussed with regard to Metz's claim for unjust enrichment, plaintiffs have not suffered an "impoverishment," nor has BANA gained a benefit unjustly.  This claim is dismissed.

### III.    <u>CONCLUSION</u>

I find that plaintiffs have failed to allege facts that state a claim upon which relief can be granted.  Accordingly, BAC's motion to dismiss Metz's complaint and BANA's motions to

dismiss the complaints of Metz and the Kriegels (documents #64, 67, and 87) are **GRANTED**.

All other motions are **MOOT** and this case is **DISMISSED.**

**SO ORDERED:**

**Dated: August 10, 2010**         /s/Nancy Gertner

**NANCY GERTNER, U.S.D.J.**